IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

FILED

JUL 22 2024

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____EKW_____, DEPUTY

ANTHONY TRUPIA,
  Plaintiff,
  v.                                          NO. CIV-24-498-J
HERITAGE HARD ASSETS LLC; et al.,
  Defendants.

**A SUPPLEMENTAL BRIEF TO PLAINTIFF'S**

**OPPOSITION TO ALL MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

|  |  | Page(s) |
|---|---|---|
| I. | INTRODUCTION | 1 |
|  | A. Pro Se Litigants and Pleading | 1-3 |
|  | B. The facts of the matter - "One Call" | 3-5 |
|  | C. Defendants, Fraud, and Unjust Enrichment | 5-8 |
| II. | CHILLING LACK OF JURY TRIAL | 8 |
|  | A. Lack of Jury Trial – Social Damage | 8-12 |
|  | B. Embarrassing Attorney Behavior | 12-18 |
| III. | ROBOCALLS AND SOCIETAL IMPACT | 18 |
|  | A. Social Damage and Dangers | 18-20 |
|  | B. Robocall Hate | 20-23 |
|  | C. Corrective Approach | 23-25 |
| IV. | CONCLUSIONS | 25 |
|  | A. The chilling effect of the billable hour | 25 |
|  | B. The chilling effect of the billable hour in this case | 25-26 |
|  | C. The problems with robocalls | 26-27 |
|  | D. The validity of plaintiff's complaint | 27-28 |
|  | E. Summary | 28 |

**TABLE OF AUTHORITIES**

| Cases | Page(s) |
|---|---|
| Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938) | 1 |
| Balistreri v. Pacifica Police Department Id. at 699. | 2 |

| | |
|---|---|
| Love v.St. Louis City Board of Education, 963 S.W.2d 364, 365 (Mo. Ct. App. 1998) | 2 |
| Pucket v. Cox, 456 2nd 233. | 2 |
| Picking v. Pennsylvania Railway, 151 F.2d. 240, Third Circuit Court of Appeals | 2 |
| Erickson v. Pardus, 551 U.S. 89 (2007) | 2, 3 |
| Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987) | 13 |
| Mey v. All Access Telecom, Inc. | 14, 15 |
| State of Indiana, et al. v. John Spiller II, et al. | 15 |
| State of Indiana v. Startel Communications LLC, et al. | 15 |
| State of Indiana v. Eric Simkin, et al. | 15 |
| State of Indiana v. Greg Sheppard, et al. | 15 |
| State of Indiana v. One Eye LLC | 15 |
| State of Indiana v. MV Realty LLC, et al. | 15 |
| Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938) | 1 |
| Balistreri v. Pacifica Police Department Id. at 699. | 2 |

| Statutes and Regulations | Page(s) |
|---|---|
| Fed. Rule Civ. Proc. 8(f) | 2 |
| Fed. Rule Civ. Proc. 12(b)(2) | 13 |
| Fed. Rule Civ. Proc. 1 | 16 |

| Attachments | Page(s) |
|---|---|
| 1. Call Flow Graphic by Plaintiff | 3 |
| 2. Call Flow from "THE ANNOYANCE ENGINE: Spam robocalls became profitable scams by exploiting the phone system, but you can stop them" | 4 |
| 3. Model of Responsibility by Plaintiff | 5 |
| 4. Defendant ONVOY, LLC Oklahoma Registration to do business with Secretary of State | 14 |
| 5. Defendant LEVEL 3 COMMUNICATIONS, LLC Oklahoma Registration to do business with Secretary of State | 14 |
| 6. Gmail from Tod Rokita, Robocall Reckoner | 15 |
| 7. P.A.C.E.R.Docket Return for: ANTHONY TRUPIA, as any party | 16 |
| 8. P.A.C.E.R.Docket Return for: LEVEL 3 COMMUNICATIONS, LLC, as defendant only | 16 |
| 9. P.A.C.E.R.Docket Return for: ONVOY, LLC, as defendant only | 16 |
| 10. P.A.C.E.R.Docket Return for: TELNYX LLC, as defendant only | 16 |
| 11. Email from BEST BUY | 17 |

## I.    INTRODUCTION

The amount of pretense and obfuscation on display from both the defendants in this case and the legal teams that represent them is sad and embarrassing to American justice. Multiple parties will probably attempt to have this motion struck even though the purpose of pleading is clear notice for involved parties only, not winning a case. Plaintiff hopes some small lenience will be granted by the court if necessary in allowing the filing of this motion addressing many parties in the case and many preceding motions, especially considering there is a new judge on this case. Plaintiff asks the court to deny all motions to dismiss. Further, if the defendant parties have absolutely no material facts or investigation-related details to offer regarding their responsibility in this matter, and do not identify the lead sellers referenced in this complaint, plaintiff will ask the court to consider summary judgment once the remaining individual defendants have been brought in to this case to answer. It is the combination of spoofing on the front end, malfeasance, misfeasance, and nonfeasance, *and* extensive legal maneuvering on the backend feeding the proliferation of spam calls, not financial, technological or legal barriers to stopping them. Plaintiff asks the court to allow him to supplement his Opposition to All Motions to Dismiss with the following topical arguments:

### A.  Pro Se Litigants and Pleading

One of the many misrepresentations defense has made in this case is the following statement by defense counsel for Telnxy: "*Trupia is pro se, so he gets some grace on things like formatting. But Trupia is subject to the same rules and procedures as the rest of the parties in this case—and represented litigants more generally.*" This is patently false and the kind of shameful attorney behavior that establishes bad case law when it goes unchallenged, which happens a lot on this particular topic. Pro se litigants are subject to the same laws and regulations all parties are subject to, but certainly are granted grace in the filing of motions and papers that exceeds "formatting." The following citations are from Plaintiff's struck motion (it's questionable if this motion should have been struck in the first place).

*"Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938).*

1

"This court recognizes that it has a duty to ensure that pro se litigants do not lose their right to a hearing on the merits of their claim due to ignorance of technical procedural requirements." Balistreri v. Pacifica Police Department Id. at 699.

Fed. Rule Civ. Proc. 8(f) "All pleadings shall be so construed as to do substantial justice."

[A] Petition filed pro se should be reviewed giving the Petition its broadest intendment, construing all allegations in favor of the pro se litigant. Love v.St. Louis City Board of Education, 963 S.W.2d 364, 365 (Mo. Ct. App. 1998).

Pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same high standards of perfection as lawyers. Jenkins v. McKeithen, 395 U.S. 411, 421 (1959); Picking v. Pennsylvania R. Co., 151 Fed 2nd 240; Pucket v. Cox, 456 2nd 233.

The plaintiff's civil rights pleading was 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiff's Pleadings without regard to technicalities." Picking v. Pennsylvania Railway, 151 F.2d. 240, Third Circuit Court of Appeals.

A document filed pro se is "to be liberally construed," Estelle, 429 U. S., at 106, and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," ibid. (internal quotation marks omitted). Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice"). Erickson v. Pardus, 551 U.S. 89 (2007).

When granting review for Erickson v. Pardus, the courts stated: "Deeming these allegations, and others to be noted, to be "conclusory," the Court of Appeals for the Tenth Circuit affirmed the District Court's dismissal of petitioner's complaint. 198 Fed. Appx. 694, 698 (2006). The holding departs in so stark a manner from the pleading standard mandated by the Federal Rules of Civil Procedure that we grant review.

It was error for the Court of Appeals to conclude that the allegations in question, concerning harm caused petitioner by the termination of his medication, were too conclusory to establish for pleading purposes that petitioner had suffered "a cognizable independent harm" as a result of his removal from the hepatitis C treatment program". Id., at 698. - Erickson v. Pardus, 551 U.S. 89 (2007).

2

*Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " Bell Atlantic Corp. v. Twombly, 550 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 7–8) (quoting Conley v. Gibson, 355 U. S. 41, 47 (1957)). - Erickson v. Pardus, 551 U.S. 89 (2007).*

*In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. Bell Atlantic Corp., supra, at \_\_\_ (slip op., at 8–9) (citing Swierkiewicz v. Sorema N. A., 534 U. S. 506, 508, n. 1 (2002); Neitzke v. Williams, 490 U. S. 319, 327 (1989); Scheuer v. Rhodes, 416 U. S. 232, 236 (1974)). - Erickson v. Pardus, 551 U.S. 89 (2007).*

Plaintiff has given defendants more than sufficient notice of his claims and this court should ensure plaintiff is granted his vital right to the fair jury trial he has demanded and is entitled to under the 7th Amendment of the United States Constitution.

**B. The facts of the matter - "One Call"**

1. Call Flow - Since plaintiff must apparently argue this entire case in pleading before reaching a jury, call flow should be discussed to show how "one call" is a gross misrepresentation of what is happening here. Attachment 1 is plaintiff's description of "call flow" based on his research into this matter over the last year and extensive experience working in call centers over 15 years.

Call flow begins with Lead Sellers. These lead sellers place millions of snowshoe calls through unrestricted and unmonitored VoIP accounts like the ones provided by defendants to create curated lead lists to sell. The curation and creation of these lists is entirely illegal because they are generated by millions of TCPA violations. Lead sellers like this make billions of calls a year, and there is literally no way for consumers to track them, stop them, or hold them legally responsible because they spoof their caller IDs.

The lead sellers are paid to commit this illegal and even criminal activity by Telemarketers looking for the cheapest leads they can purchase. When consumers inform these companies they never requested contact and/or request the source of the leads they buy, these companies refuse to provide any information. Because these companies refuse to reveal the lead sources they buy from even to aggrieved

3

customers, there is still no way to track these calls, stop these calls, or hold them legally responsible if "just one call" actually works as a defense.

The VoIP providers, or Common Carriers, are complicit in both sides of this activity. As the CEO for Telnxy himself has stated, these companies basically provide "self-service" to their clientele; anyone can sign up with little to no oversight. Both the providers of the snowshoe calls and the telemarketers in this case are using services provided by the defendant common carriers. The common carriers in this suit are not vetting clientele, not monitoring for illegal activity, do not investigate when illegal activity is alleged or proved, and do not suspend services when they know telemarketer customers are in violation of the law. They have shown no evidence they do any of these things regularly. With the extensive financial and legal resources common carriers have, they are usually able to buy off or scare off the few parties with the financial means to hold them responsible. This again leaves consumers with no ability to track these calls, to stop these calls, or to hold anyone legally responsible if common carriers are not held responsible when they ignore complaints from consumers about illegal activity.

Defendants in this case will want to argue that plaintiff has no proof of this model, that it's the conclusory ramblings of a frenetic layman, however, the same model has been published by Business Insider in an article titled "*THE ANNOYANCE ENGINE: Spam robocalls became profitable scams by exploiting the phone system, but you can stop them*." Attachment 2 is a graphic from the article, and clearly shows the same system plaintiff has described after an extensive investigation. The "closer" referred to in the Business Insider article is a "telemarketer" as described in this complaint.

The snowshoe calls at issue in this case clearly would not exist but for the Telemarketers paying for them and the Common Carriers serving both the snowshoe callers and the Telemarketers illegally profiting off of these leads. Both the Telemarketers and the Common Carriers in this suit are unjustly enriched by this illegal activity.

Each defendant in this case had the power to stop all of these calls and is unjustly enriched by these calls. The telemarketers could give up their lead sources on report, if they are legal American entities, and then plaintiff would have been able to pursue the lead sellers if they were legitimate American companies. The common carriers could stop servicing telemarketers that buy illegal leads on report. Instead, these defendants

4

and many like them choose to continue their illegal activity because it is just too profitable not to, and to cover each other's tracks.

2. Defendants in this case claim they should not be responsible because there is nothing they can do to alleviate the illegal calls they are funding, but that is not the case. As plaintiff demonstrates in attachment 3, "Model of Responsibility," a simple legal strategy could effectively stop over 99% of these calls. The common carriers could simply add or enforce two simple provisions in their contracts: 1. *Telemarketers are required to immediately disclose the source of their leads to aggrieved consumers, and, 2. Telemarketers are required to purchase leads from businesses legally registered to do business in the U.S.A.* There would be no legal loopholes left for defendants or 3rd parties to avoid liability any longer, and 99% of spam calls would stop because there would be no safe market for them. There would always be an American legal company held responsible one way or the other. Defendant common carriers could stop spam calls by adding less than 100 words to their contracts. They refuse to add these terms, *or any effective terms like them,* because the know the overwhelming amount of their customers are not operating legally. There is no way spam calls will ever end if Common Carriers and Telemarketers both are not part of the Loop of Legal Responsibility.

## C. Defendants, Fraud, and Unjust Enrichment

1. Fraud – One of the topics we should discuss briefly if we are arguing this entire case in pleading is fraud. Plaintiff did not allege fraud, because plaintiff is not specifically the victim of it, but fraud is happening, and the courts should allow plaintiff to prove this in argument and discovery as well if the defendants wish to argue this entire case in pleading. The fraudulent conduct of defendants contributes to "knowing and willful" element of the TCPA damages. The fraud being perpetrated by the defendant telemarketers is on their own sales staff with the fake illegal leads they are purchasing.

a. Defendants have repeatedly thrown around the word 'conclusory' when referencing allegations made in plaintiff's complaint, but the allegations are far from conclusory. They are based on roughly 15 years experience working in and out of call centers, telemarketing jobs, and sales jobs, and based on overwhelming evidence plaintiff has seen in the last year.

5

b. To understand the fraud happening here, the court must first understand how 'leads,' or opportunities to make sales, work in telephone sales. The first important distinction to understand is between inbound and outbound calls. Inbound calls are made when a consumer party calls in to a company to purchase a good or service they want. These are overwhelmingly legitimate sales calls. Job offerings for inbound sales calls are incredibly rare because it is hard to generate regular inbound sales traffic without an incredible product. Most telemarketing jobs involve placing outbound sales calls. Outbound calling is also generally considered 'cold calling.' People looking for telemarketing jobs are well aware of all these distinctions and consider all of these things when looking for a telemarketing job. Telemarketing employees looking for jobs expect, based on job offers and advertising, that the jobs they take are providing *some* kind of qualified leads for them to cold call. Most potential telemarketing employees would not for example be willing to make cold calls 'out of the phone book.'

On the flip side, many of the employers offering telemarketing jobs, like the defendants in this case, do not actually have any legitimate lists of potentially interested customers for their employees to call. They haven't made partnerships with other companies. They haven't run their own advertisements. They haven't employed people to run word of mouth campaigns or social media campaigns to generate interest or inbound calls. They have not done any of the real work required to make themselves legitimate employers. They would happily have employees make cold calls 'right out of the phone book' for no cost, on commission, if they could, and they would but for the fact that they wouldn't be able to keep any employees that way.

Companies with no leads have little to no value to salespeople, many of which survive on commission. The sole reason defendants like the telemarketers in this case buy these terrible quality leads from lead sellers is to defraud their own sales employees into making outbound calls under the fraudulent pretense that the people they are calling have shown interest in their products. There is honestly no other good reason for companies to buy lists of names of people who are already being called by hundreds of spoofed phone numbers and scores of other businesses. The only rational reason to purchase these leads is to defraud sales

6

employees into working with no resources after waiting weeks or longer for a job to start.

Employees at these jobs are treated like dirt by the 'leads' they call; they are screamed at, cursed at, told to kill themselves (plaintiff has experienced this many times), they quickly figure out that the leads they are calling are not what is described, but often have to continue at these jobs until they can find other work because it takes months to find a job now. They have no choice but to keep dialing and harassing average people they know do not want contact to survive until they can find real jobs again. These employees often become depressed, angry, and abusive to the consumers they end up calling. The fraud happening at these fake telemarketing companies, like HLV, offering imaginary access to SpaceX IPOs, is damaging to many parties and should be fully explored in discovery where the public can see what kind of companies these 'common carriers' work with, and that all parties named in this suit are "knowingly and willfully" contributing to these calls.

2.      No ID, no responsible parties – This court should strongly consider the arguments defendants are making, that no party can be able to be held responsible for unidentified calls. It is untenable. 80% of Americans no longer leave their phone ringers on. There is no way to hold snowshoe calling lead generators directly responsible because there is no way to ID parties with spoofed phone numbers. The only way to stop these calls is to hold the parties who are identifiable and unjustly enriched by this practice responsible.

3.      Unjust enrichment – If plaintiff did make a second mistake in his complaint, maybe it was not including unjust enrichment as a cause of action. Plaintiff didn't include unjust enrichment because the TCPA and Oklahoma statutes should be more than enough for plaintiff to survive standing, and reach judgment, but this case does revolve around unjust enrichment. The spoofed phone calls would not take place but for the unjust enrichment they generate for the executives of each of these companies. Each executive involved knows how this business model works, and enjoys irregularly large salaries for their malfeasance, misfeasance, and nonfeasance in the continued generation of these calls.

4.      Unity of defendants – this court should consider the unity of defendants and uniformity in their actions, both before and after the filing of the complaint. Not a single

telemarketer has revealed or will reveal their lead sources. We are not talking about trade secrets here, we are talking about identifying parties responsible for illegal behavior. None of the Common Carriers responded in any way for months before the filing of this action, and this is not the first time they have been named defendants together relying on each other's arguments to avoid litigation. Each of these parties could have filed counter claims or 3rd party claims bringing in the lead sellers that have generated the 'leads' at issue in this suit, and no party does so. The attempt to cover up excessive illegal activity through unity in excessive pretense, obfuscation, over-litigation against consumers and under-litigation against complicit parties is obvious to a reasonable person.

5.      Any executives which have taken part in these activities in the last seven to ten years, whether or not they are currently with their companies, have been and presumably still are, through stock rewards and similar, being unjustly enriched by these activities and the malfeasance, misfeasance, and nonfeasance that led to them. No party to this suit should be dismissed.

## II.      CHILLING LACK OF JURY TRIAL

### A.  Lack of Jury Trial – Social Damage

1.      Plaintiff is already quite frustrated with this case and the legal system in general, for valid reasons, and plaintiff is not alone in this frustration. It is unreasonably difficult to reach a jury trial in the modern American legal system. Trial by jury has been a pivotal institution in the United States' social and constitutional structure since the founding of this country, and should be preserved. The Civil Justice Research Initiative, part of UC Berkeley School of Law, in a recent 37 page report titled "*The Civil Jury-Reviving an American Institution,*" makes the following arguments for plaintiff on why he should be allowed the jury trial he is entitled to:

"*The Seventh Amendment of the U.S. Constitution and similar provisions in state constitutions protect the rights of litigants to rely upon juries to resolve most legal civil disputes. This liberty is deserving of this type of foundational protection because it ensures a significant degree of popular control over the application and development of the law.*"

"*Yet, legal, political, and practical attacks and challenges over time have hollowed the constitutional promise and role of the civil jury. As noted herein, these include:*

8

• *Procedural changes stripping juries of their fact-finding authority and empowering legislatures and judges in ways beyond their expertise and constitutional role*

• *Political and social elites, buoyed by moneyed interests, engaging in a decades-long campaign to denigrate the democratic role of juries in civil dispute resolution*

• *Recently, COVID-19's unique constraints on the empaneling and use of civil juries, grinding trials essentially to a halt"*

*"The majority of civil disputes today are resolved not by laypeople serving as jurors but through private and publicly funded settlement and arbitration proceedings. The result is a tragic loss of the demonstrable sociopolitical benefits of jury service, including the:*

• *Enhanced quality of jury fact-finding due to the diversity of voices and required deliberation in jury decision making*

• *Increased rates of civic engagement among those who have served as jurors to the point of issuing the final verdict*

• *Widespread allegiance to the legitimacy of the civil justice system and democratic self-governance through the public airing and resolution of private disputes"*

*"Much is risked if the attacks on the civil jury continue and if efforts are not taken to reverse the damage already done. "*

**"Civil procedures adopted over the course of the twentieth century have played a central role in the jury's decline. Many point to the adoption of the Federal Rules of Civil Procedure in 1938 as a pivotal moment of transformation."**

**"A Culture Discouraging of Civil Jury Trials Encourages Shortcuts in a Crisis."**

*"Research on jury size shows that verdicts reached by twelve-person juries are more representative, more reliable, and less influenced by outlier juror preferences than those verdicts reached by smaller-sized juries."*

*"The transparent and public nature of civil jury trials, allowing the presentation of evidence on both sides, providing litigants the opportunity to be heard, and giving citizens the right to decide the outcomes, operates to reinforce democratic self-government."*

*"Given the centrality of the civil jury in the United States' democratic structure, as well as the benefits the jury offers for the fair, accurate, and public administration of civil justice, it is imperative that active measures be taken to revive the institution to its once*

premier role. This is particularly true given the challenges that the COVID-19 pandemic poses and is likely to continue to pose to the institution for the foreseeable future."

**" The first step to reviving the civil jury as an institution is ensuring that all litigants who desire a jury trial are able to receive one. "**

2.    In Stanford University's essay "*Justice for All - Why We Have an Access to Justice Gap in America—and What Can We Do About It*" they argue:

"The study, titled "Reasons for the Disappearing Jury Trial: Perspectives from Attorneys and Judges," is based on a survey of 1,460 lawyers and judges from 2016 to 2019."

"Lawyers and judges surveyed said that while jury trials are less predictable, slower and less cost-effective than alternatives, they are also fairer. By large margins, lawyers and judges said jury trials are worth the costs associated with them."

"These responses "suggest that measures should be taken to reverse the recent downward spiral in the prevalence of jury trials," the survey concludes."

"The right to a jury trial in criminal and civil cases is guaranteed by the U.S. Constitution, but jury trials have been vanishing for decades," ABA President Patricia Lee Refo said. "This new study again confirms what other ABA studies have long shown -- that our laws and customs need a fresh look to ensure that jury trials, a cornerstone of the American justice system, do not disappear altogether."

"The percentage of federal lawsuits decided by jury trial dropped from 5.5% in 1962 to 0.8% in 2013. The percentage of federal criminal cases decided by jury trial dropped from 8.2% in 1962 to 3.6% by 2013."

3.    Rand Research has also contributed solid research and opinion to this topic in a research brief titled "*Sharp decline in disputes that result in jury trial.*" They stated "*The process of resolving disputes through the U.S. civil justice system has become increasingly opaque. The cause is a sharp decline in the number of disputes that result in a jury trial, which provides a public record of the proceedings, the decision, and the amount of compensation, if any. **Today, more than 95 percent of disputes end in settlements before they get to trial, and the terms of these settlements are rarely disclosed.**"*

4.	The following excerpts are from a Newsweek article where they researched this negative trend in combination with the pandemic measures. The findings are outrageously sad.

*"During the pandemic, civil jury trials came to a stop."*

*"Even before the pandemic, the rate of civil cases going to trial in federal court was under 0.5% — a sharp decline from the 5.5% figure of the mid-twentieth century. In state court, the rate of jury trials in civil cases is even lower — under 1%."*

*"According to the Administrative Office of the U.S. Courts, the rate of federal jury trials was 5.5% in 1962 but had fallen to 1.2% by 2002. That rate dropped to a meager 0.48% in March 2020 when the pandemic took hold and fell further by the end of 2020. The rate of civil jury trials in state court has similarly fallen dramatically — from around 1.8% in 1976 to between 0.6% and 0.9% as of 2019."*

*"This research suggests a number of possible explanations for the decline in the number of jury trials. **One is that the Federal Rules of Civil Procedure discourage jury trials.**"*

*"**Another possibility is that in recent decades, the Supreme Court has approved a broad use of motions to dispose of cases before trial, whether at the pleading stage (Rule 12(b) (6)) or for summary judgment (Rule 56).**"*

*"Thus, research from the report, "The Civil Jury: Reviving an American Institution," indicates there may be a reason to be troubled by the disappearance of the civil jury, which provides benefits to the justice system that simply "cannot be recreated by judges, administrative systems, or private arbiters.""*

*"This research identifies at least four benefits that a civil jury trial provides as compared to bench trials or private arbitrations: '(1) the civil jury's competence in fact-finding; (2) the extent to which civil juries allow for community input into the resolution of civil disputes; (3) the civil jury's impact on civic engagement of the citizenry; and (4) the contributions of civil jury trials to the transparency and legitimacy of the legal system.' "*

5.	This trend is very clear and very damaging to American confidence in the legal system and Americans' ability to have their legal rights validated. Our rights are literally not real if there is no practical way to express them. This court should not ignore this trend, this court should not ignore plaintiff's fair demand for a jury trial on the facts

of the matter. The courts should strive to provide a trial by jury every time one is requested. The defendants in this case may not want a jury trial because they are involved in millions or even billions of expensive legal violations every day, but attorneys, judges, and normal lay people overwhelmingly agree jury trials are the fairest way to resolve conflicts and substantiate justice.

6.    Many of these articles dance around this topic carefully, but it is very clear to any reasonable person who is not on the billable hour where a large responsibility with this terrible issue of shrinking jury trials comes from: abuse of the pleading process. The purpose of the pleading process is for defendants and the courts to receive fair notice of the complaints made, not for a case to be won or lost on sophistry.

## B. Embarrassing Attorney Behavior

In blind pursuit of the billable hour and with a 'win at all costs' attitude, legal representatives for these defendants are abusing the pleading process in an attempt to deprive the plaintiff of his 7th Amendment right to a civil jury trial, and just as importantly, the rights of a civil jury to hear this case. Robocalls are a top rated concern by consumers in every state in the nation. These attempts include a gross amount of misrepresentation, material omission, ad hominem, and generally making barely relevant or entirely irrelevant arguments. The following is not a complete list, but a list of examples of this behavior in this case:

1.    Misrepresentation – Most recently for example, counsel for HLV argues in docket entry 66 "*Plaintiff has not cited, and HLV cannot find, any aspect of this doctrine that dictates a removal causes a waiver of a party's Rule 12(b) defenses, or a stipulation of the sufficiency of a complaint.*" This is a poor reframing of the issue the court should not accept. It obviously is a mis framing; plaintiff never once used the word waiver for example. Courts do not consider matters until they are explicitly brought to the attention of the court. The federal rules of civil procedure are less than 100 years old, a short period in legal history, and should be carefully considered and tested against any potential legal conflicts they may present. Plaintiff never made any reference to waiver of defense. Plaintiff presents what appears from his research into this topic to be pristine logic demonstrating a novel problem, it would be sad if this court didn't even consider such an obvious contradiction.

    a.     Major Premise: Under FRCP 12(b)(2), parties, by presenting any paper to the court, certify to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law

    b.     Minor Premise: all defense attorneys filed notices agreeing federal question jurisdiction was proper under the federal rules of civil procedure.

    c.     Conclusion: All attorneys have certified their belief that federal question jurisdiction is proper and that they have researched this reasonably.

    d.     Major Premise: "*The presence or absence of federal question jurisdiction that will support removal is governed by the "well-pleaded complaint rule," under which federal jurisdiction exists only when a federal question is presented on the face of the properly pleaded complaint*." Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987).

    e.     Minor Premise: All attorneys have certified their belief that federal question jurisdiction is proper and that they have researched this reasonably.

    f.     Conclusion: In certifying that removal was proper, all attorneys have certified their belief that the complaint is "well-pleaded" or "properly pleaded."

2.    Plaintiff makes no statement about whether or not the defendants have waived any rights, defense just wishes to frame it that way. Defendants could easily fire their current attorneys and hire new ethical attorneys that do not believe the complaint is "well-plead" whenever it is convenient, and have them plead differently if they still had the time, for example. The facts of the case could also change if the defendants presented literally any evidence competing with plaintiff's claims, but that has not happened here. Plaintiff is making a clear statement about the conflicting certifications of attorneys that abuse the pleading process to avoid the requirements of the 7th amendment when it is inconvenient for them, both in general and specifically in this case. It is a misrepresentation of plaintiff's claims regarding this matter to claim this is about defendants waiving rights when it is about conflicting certifications made by unscrupulous attorneys. There is no reason the federal courts, which are of limited jurisdiction, should be the recycling bin for shameless corporate giants and their legal

13

teams any time they want to pluck a case from state court and have it dismissed in the forum most convenient for them. If defendants believed these claims should be dismissed, they could just as easily have argued that in state courts, and they make no argument why they couldn't. Federal removal isn't a defense to be preserved, it's a mechanism for bringing a properly pleaded federal complaint to the attention of the federal courts.

3.     Material Omission – The overwhelming body of argument from all these defense attorneys relies on material omission. Over and over, these defendants try to reference "one call" for matters of jurisdiction and standing when the complaint clearly makes it plain the body of calls, hundreds, is at issue, and that failure to act is at issue. Of course, when it is convenient to shame plaintiff, defendants are happy to admit plaintiff is alleging joint activity and responsibility. In docket entry 60 for example, defense argues that "...*Plaintiff alleges engaged in an illegal telemarketing conspiracy.*" That alone would be misrepresentation, but the defendants provide exactly no evidence or even claims about what their business models are to support these legal suppositions in all motions. They rely on material omission in concert with these legal allegations. They do not plainly allege their clients do not call Oklahoma regularly, or allege their clients do not do business in Oklahoma. They repeatedly leave out material information they know makes their claims about jurisdiction false. The first example of this is the order from *Mey v. All Access Telecom, Inc.* in which they are defendants and have been told by the courts they can be held responsible for this kind of behavior even if they are common carriers. They claim later in this case they "*cannot*" be held responsible as common carriers. The second is in the common carriers' own registrations with the Oklahoma Secretary of State, both Onvoy and Level 3 are registered to do business in Oklahoma, see attachments 4 and 5. All defendants rely on empty arguments of law with zero supporting material facts relevant to the matter at hand and often leave out case law or details they know are relevant but work against them.

4.     Lack of Relevance – In order to support motions entirely devoid of any material facts or claims about the defenses' positions in this matter, the defense attorneys in this case have relied on large amounts of generic case law in displacement of the case law relevant to them and these matters. There is plenty of directly relevant

case law for these courts to rely on to show the courts have jurisdiction over defendants like these in matters like this, that this complaint is proper, and even that the court should consider piercing the corporate veil:

    a. *Mey v. All Access Telecom, Inc.*

    b. *State of Indiana, et al. v. John Spiller II, et al.*

    c. *State of Indiana v. Startel Communications LLC, et al.*

    d. *State of Indiana v. Eric Simkin, et al.*

    e. *State of Indiana v. Greg Sheppard, et al.*

    f. *State of Indiana v. One Eye LLC*

    g. *State of Indiana v. MV Realty LLC, et al.*

In attachment 6, Tod Rokita, State Attorney General for Indiana, states the following: *"Today, robocall tracking sites like Robokiller have removed Indiana entirely from their "top scammer target states," revealing a reduction of tens of millions of scam calls since 2020."* As a State Attorney General has recently proved, the effective way to stop spam calls is to hold all violating parties responsible for their illegal conduct, including common carriers.

  5. Ad Hominem - The attorneys for this case, as is very common, began with a sad amount of ad hominem attacks for supposed professionals, sometimes directly, and sometimes by reference. It is sad the legal profession cannot see statements like this for the attack they are on all lay-people. The law is complicated, the procedures are complicated, and guidance is non-existent for parties that are not part of a law firm. Pro se litigants, lay-people, are bound to make mistakes. They should not be shamed by the legal profession for asserting their legal rights at any time. Ludens complained this action was vexatious before it was ever filed, but certified the complaint was "well-pleaded" and that federal removal was proper a short time later. Telnyx labeled the allegations "frenetic." Telnyx states plaintiff's complaint is "screed laden with grievances and irrelevances," but then also certified this complaint was "well-pleaded." Defense for HLV refers to plaintiff's complaint as "discursive," basically calling plaintiff a rambler, but HLV filed the original notice removing this complaint to federal court and claimed the complaint is "well-pleaded." Pleading is supposedly a process for

defendants to get fair notice of a complaint, but it clearly in practice is an opportunity for defense attorneys to diminish plaintiffs and chill civil rights instead.

6.     Defendants wish to use the Ad Hominem attacks and other methods to paint a picture of a plaintiff abusing the legal process, but a quick look at P.A.C.E.R. makes it brutally clear which parties, if any, are abusing the legal process to cover bad faith behavior. This contrast is illustrated in attachments 7, 8, 9, and 10. A search for "Anthony Trupia," as any party and with all terms open, returns only 2 results on P.A.C.E.R. One of those results is this case here, and another is a different Anthony Trupia. This is the only action in federal court plaintiff has ever been part of. Conversely, we can see defendants like the common carriers are regularly parties in cases just like this one, hundreds of times more than all 'Anthony Trupia's that have ever existed. Just as defendants, the common carriers in this case are part of hundreds of court actions. Level 3 Communications LLC has been part of 463 lawsuits as defendants. Onvoy has been part of 24 lawsuits as defendants. Telnyx is newer than the other two defendants, but has already been part of 3 other actions including the notable *Cohen v. Meta, Inc. et al.*, as defendants. None of the common carriers are strangers to court action regarding matters like this, and these are just the results from the small fraction of the public that can afford legal representation... As will be discussed in more detail later in this brief, defendants are not party to this significant amount of litigation just because they are large companies; defendants are party to this significant amount of litigation because their legal departments negligently ignore all notice of illegal behavior until they are called to account by a party that has the significant resources to hire expensive attorneys.

7.     Limit Testing – Defense attorney Tifft specifically has clearly been limit testing at direction from his firm from the beginning of this case. He challenges every inch of each and every motion filed, without fail. While limit testing is certainly ethical for learning in many scenarios, this isn't one of those of scenarios. Unnecessary motion practice, especially in pleading, is a burden on his own client financially, a burden on the courts, and a burden on plaintiff when all parties should be striving to "*secure the just, speedy, and inexpensive determination of every action and proceeding*" under FRCP Rule 1. Hall Estill should have Mr. Tifft and other young associates draft practice

motions on their own time and bill instead of burdening the general public and the courts with his learning process.

8. Defendants' "Legal Strategy" amounts to "Deprivation of Civil Rights" – Under close examination, this court will see the legal strategy of the defendants here is part of a chilling pattern sweeping across American businesses enabled by the legal profession and their $300/hour bills that should be utterly rejected by the courts. Defendants like the Common Carriers in this suit, with access to large financial resources, legal resources, and data, are knowingly engaging in mass quantities of low-dollar-amount illegal behavior knowing that average consumers cannot afford $300/hour attorneys to stop them. The supposed "abuse" and "customer service" departments are just flimsy covers for filtering out the few consumers with legal representation before they become part of the public record as often as possible. These departments entirely ignore reported abuse when they see no signal a consumer has legal representation. Attachment 11 for example, is an example of this policy plaintiff is describing in plain text, described by one of America's largest corporations: Best Buy. In this email, a Best Buy representative clearly explains that Best Buy does not under any circumstances even notify their legal departments of potential legal problems unless (a) an attorney sends the demand letter, or (b) a suit is filed. Under no circumstances will the Best Buy legal department interface with valid concerns from consumers unless legal action is brought first. Defendants in this case will argue that this attachment is irrelevant, that it has nothing to do with them because it is a different party. Defendants will not however describe their own legal policies in contrast. Plaintiff has solid reason and plenty of evidence to allege the defendants are operating in the same fashion. The legal representatives for every single defendant here motioned the court for more time to respond in spite of plaintiff's opposition, however, each defendant was given ample notice, months before this suit was filed, that legal action was imminent if no corrective action was taken. Plaintiff even emailed all defendants a copy of the complaint draft over a month before it was filed. Plaintiff contacted their abuse departments months before this lawsuit was filed, and defendants at no time described any corrective action they had taken, still describe no corrective action they have taken, and never had their legal departments reply to a single contact until this suit was filed. Plaintiff still to this day receives spam calls for "Howard Ship", now ongoing for a year and ongoing for

17

months following the notice provided to these defendants. The only reason defendants in this case needed more time to prepare was because they chose to ignore this issue for months beforehand and do so regularly with all complaints like this as a 'course' of business. Defendants like the common carriers in this case ignored complaints of illegal behavior for months until the very moment a lawsuit was filed; they should not have been granted extensions of time, and they should now explain themselves fully before this court if they do not wish to be subject to summary judgment and to a jury if summary judgment is not granted. The reason plaintiff objected to all requests for more time was exactly because these legal departments refused to communicate with plaintiff in any way until this lawsuit was filed, not as a simple matter of procedure like they do. Defendants had adequate notice of all the issues at hand. <u>Defendants have now had ample time to answer this complaint and have not submitted a single material fact in hundreds of pages of motions.</u> This complaint should not be dismissed. This court should not sanction mass corporate abuse of the middle and lower classes in this fashion and should reject this legal 'business model' for the preservation of justice and consumer rights. This court should instead deny all motions to dismiss and consider summary judgment when it is requested.

## III.   ROBOCALLS AND SOCIETAL IMPACT

### A.  Social Damage and Dangers

1.  The law that addresses these problems for consumers, the TCPA, was established in 1991. Despite the fact that this bill was passed 30 years ago and the fact that the bill assesses quite stiff damage awards for even individual calls like this, millions of calls like this still take place every day. The problems this is causing for society in general, let alone plaintiff, are huge.

2.  The following excerpts are from "*Most Americans don't answer cell phone calls from unknown numbers*" by the Pew Research center.

"*Eight-in-ten Americans say they don't generally answer their cellphone when an unknown number calls, according to newly released findings from a Pew Research Center web survey of U.S. adults conducted July 13-19, 2020.*"

"*People's reluctance to pick up phone calls they don't recognize can affect a variety of activities, including participation in contact tracing programs to identify and isolate those who have contracted COVID-19. Recent reports*

*suggest that some public health authorities are struggling to make contact with those who have been exposed to COVID-19."*

*"Less clear is why Americans are not picking up their phones. Some might be overwhelmed by robocalls, others might be taking advantage of call blocking technology and some might screen calls for reasons related to their work or their daily routines."*

Despite the poor choice of wording in the last paragraph, the problem is very clear to consumers, which is why it's the first 'possibility' mentioned: consumers don't pick up the phone because of spam calls. Consumers can't stop robocalls or hold robocallers responsible in the face of the incredible gatekeeping the legal profession is doing to protect unscrupulous companies like this, so instead most consumers just give up on their own phone ringers. 80% of Americans can no longer use their phone ringers all this spam is so bad. The economic losses are staggering. As Pew Research points out, this caused significant problems with contact tracing during the pandemic. Were the country to experience another more significant event like this, millions of people could end up dying because we no longer answer the phone for unknown numbers because of the proliferation of spam calls. Millions of people could die in the next pandemic because unscrupulous actors like KYLE PATTON, STEVE FRANCIS, ROD PARSLEY, BRANDON MENDELSON, DAVID CASEM, IAN EITHER, JAMES WHEDBEE, MANDI MENA, BRETT SCORZA, JAMES HYNES, G EDWARDS EVANS, MATTHEW CARTER JR, JEFF STOREY, and other executives like them just need to make an extra unjust buck at everyone else's expense. Any responsible government should take whatever measure necessary to immediately reverse this trend and hold these unscrupulous actors responsible.

3. Business Insider, another respectable publication, stated the following in an article titled "Why Spam Robocalls Are on the Rise and How to Stop Them:"

*"A February 2021 Insider survey conducted on SurveyMonkey Audience found that 46% of Americans reported receiving spam phone calls on their cell phone every day, with another 24% receiving them multiple times per week."*

"*Spam calls impact everyone evenly. Eighty percent of Democrats got spam robocalls at least weekly, as did 79% of Republicans. They impact men (76%) and women (78%), old (85%) and young (66%), rich (72%) and poor (71%).*"

"*Nobody is safe, nobody can escape them, and for many it seems nothing can stop them.*"

4. At least 70% of Americans, total, report receiving spam calls at least multiple times per week. Every one of the millions of these calls to consumers is an illegal drain on the economy, people's resources, and people's peace of mind. The overwhelming majority of us have no contractual relationship with these spam callers, at all. They have no right to use the phones and service we pay for, for their illegal advertising or the illegal sales calls that follow. Plaintiff begs this court: we have said "No, Stop, Don't" in every way imaginable, do not sell-out our privately owned resources to any unscrupulous corporation that wishes to use them for free. We work hard for our expensive smart phones and to pay our expensive cell phone bills and we have paid to enjoy them in peace.

## B. Robocall Hate

1. In plaintiff's complaint, when describing how spam calls meet the test for Intrusion Upon Seclusion, plaintiff stated: "*As a matter of fact, people hate spam telephone calls. The judge in this case will have received spam calls they hate. The attorneys for the defense will have received spam calls they hate. Everybody in America receives these calls and hates them.*" This is no exaggeration by plaintiff.

2. Ajit Pai, Former Head of the FCC, stated in an article called "*Ajit Pai, Former FCC Head Hates Robocalls:*"

"*If you have a cellphone, you probably love it and hate it. The main reason you hate it is very likely to be robocalls.*"

"*If Americans can agree on anything these days, it's that they're fed up with robocalls. The scam calls. The calls from foreign countries at 2 a.m. The deceptive caller ID "spoofing," which happens when a caller falsifies caller ID information to make it look as if they're calling from your area code.*"

"*Unwanted robocalls are far and away the top consumer complaint we get each year at the Federal Communications Commission. They're more than 60% of the complaints we receive. And when consumers complain to us, they don't*

distinguish between illegal calls, scam calls, telemarketing calls and spoofed calls. They simply lump them together under one category: unwanted."

"One woman recently told me she felt like robocallers had absconded with her expensive smartphone by bombarding it so frequently with unwanted calls."

"I hate robocalls as much as you do. I get them myself on my mobile phone, I hear about them from my family and friends, and I know that consumers want to reclaim their sanity. I'm optimistic that the strong FCC proposal to allow these calls to be blocked by default will help get us there — and hasten the end to what one former senator rightly called the "scourge of civilization." "

It is not exaggerated speech or hyperbole in any way to say "People hate spam calls." It is plain statement of fact. Everybody hates these calls because they are abusive. The defendants in this case ask this court to ignore the will of all Americans not unjustly profiting from this situation, it is truly an absurd ask and all motions to dismiss should be denied for the substantiation of justice.

3. In the email included as attachment 6, the office of Todd Rokita, the most successful State Attorney General battling robocalls, who styles himself as the "The Robocall Reckoner," says the following about this fight to end robocalls:

"In the years leading up to Rokita's tenure as attorney general, Consumer Reports and trade magazines described the billions of robocalls hitting Indiana as 'an epidemic...no phone is safe.'"

"Rokita and his office's Data Privacy and Identity Theft team declared war on robocallers in 2021, filing a first-of-its-kind lawsuit against Startel Communication LLC, a now-banned gateway operation that allowed robocallers from India, the Philippines and Singapore to freely harass Hoosier phone lines."

"Today, robocall tracking sites like Robokiller have removed Indiana entirely from their "top scammer target states," revealing a reduction of tens of millions of scam calls since 2020."

"Everyone knows robocallers are a huge nuisance, but they pose dangers much worse than merely disturbing the peace. Quite often, these robocalls are part of criminal schemes aimed at stealing Hoosier's identity and taking our hard-earned money. These annoying and illegal calls are the work of professional scammers looking to prey on unsuspecting victims. That's why we

*have fought robocallers so doggedly since my first day in office, issuing around $392 million in fines and settlements from robocalling operations."*

*"Many robocalling operations move frequently from state-to-state or even nation-to-nation, dissolving and then reappearing under new names. That makes pursuing individual robocallers a daunting, uphill task."*

*"In response to their changing tactics, Rokita's anti-robocall attorneys led the innovative approach of going after the telecom gatekeepers: Voice-Over-Internet-Protocol (VoIP) providers. The move allowed Indiana to curb millions of calls and block out foreign scammers who abuse the American phone system. In another novel approach, Rokita's anti-robocall attorneys also targeted another key ally of robocallers – people like Michael T. Smith and Scott Shapiro – operators of the physical call centers that profit from these robocalls."*

This court does not need to take plaintiff's word for anything when the leading State Attorney General combatting robocalls has plainly detailed how to handle robocalls. <u>The only reasonable way to combat spam callers is to hold VoIP providers and telemarketers directly responsible for these calls</u>. These calls are a nuisance, a national epidemic, criminal schemes, and fraudulent businesses and their executives unjustly profiting from them should be held to account in this court just like they are in Indiana.

4. In an ABC News article titled *"Lawmakers, tech industry look to thwart robocalls,"* more lawmakers and state representatives, from all parties, are quoted pointing out how problematic robocalls are:

*"We're now at a point in my house where, when the [landline] rings, I tell my husband don't answer,"* Rep. Debbie Dingell, D-Mich., said at a Digital Commerce and Consumer Protection subcommittee hearing Friday with founders of Robocall blocking systems, including RoboKiller and Nomorobo, as well as other tech executives.

*"I am going to be in the get even mode here real soon with these scammers,"* Rep. Greg Walden, R-Ore.

Adrian Abramovich (a notorious robocaller), testified in front of the Senate Committee on commerce, Science and Transportation, saying: *"There is*

available open-source software that can be misused by someone to make thousands of automated calls with the click of a button."

Defendants in this case demeaned plaintiff for his "crusade" (their words, not plaintiff's words) against robocallers, but there is nothing irrational about crusading against illegal robocallers, or wanting to "get even" with them. These are natural reactions to unending harassment. If defendants want to call this action a "crusade," then plaintiff prays the court will let him bring this "crusade" before a jury to determine it's validity.

5.   The FCC itself states combatting robocalls and malicious caller ID spoofing is a top priority in many publications, including a publication titled "*Robocall Response Team - Combating Scam Robocalls & Robotexts - Federal Communications Commission*":

"*The FCC has made combatting unlawful robocalls and malicious caller ID spoofing a top consumer protection priority.*"

"*U.S. consumers receive approximately 4 billion robocalls per month, according to private analyses. Unfortunately, advancements in technology make it cheap and easy to make massive numbers of robocalls and to "spoof" caller ID information to hide a caller's true identity.*"

6.   Robocall and spam call hate is real, is widespread, and most importantly, is completely justified. No rational court can sanction this massive, irrational, illegal action.

## C.  Corrective Approach

1.   This problem has continued for over 30 years now, and this court should adopt the attitude of the most aggressive government actors fighting spam calls to achieve an effective corrective approach to this problem.

2.   In "FCC News - DOC-402506A1" the FCC quoted NC SAG Josh Stein: "*We can't keep playing whack-a-mole to shut down bad actors who keep creating new companies so they can spam us with robocalls. I'm grateful to the FCC for being a close partner in our efforts to put a stop to these nuisance calls,*" said North Carolina Attorney General Josh Stein, the founder of the state attorneys general Anti-Robocall Multistate Litigation Task Force."

23

3. In the same email quoted earlier in this motion, Tod Rokita, SAG for the state of Indiana, said the following about effectively fighting robocalls:

"*In response to their changing tactics, Rokita's anti-robocall attorneys led the innovative approach of going after the telecom gatekeepers: Voice-Over-Internet-Protocol (VoIP) providers. The move allowed Indiana to curb millions of calls and block out foreign scammers who abuse the American phone system. In another novel approach, Rokita's anti-robocall attorneys also targeted another key ally of robocallers – people like Michael T. Smith and Scott Shapiro – operators of the physical call centers that profit from these robocalls.*"

"*Winning the war on robocallers requires constantly staying on offense and tracking the latest technologies the scammers are using to carry out their schemes," Attorney General Rokita said in March 2023, following a string of large settlements and trial victories against multistate robocall operations.*"

"*If you aid and abet lawbreakers in their commission of criminal acts, then you had best expect to be held accountable for your own role in those misdeeds," Attorney General Rokita said this week, four years into his anti-scam caller crusade. "We have sent that message loud and clear to the culprits paving the way for illegal robocallers, and we're going to keep going after them tooth and nail.*"

4. As SAG Tod Rokita has made utterly clear both in press releases like this and the cases he has litigated, the courts must be aggressive in holding robocallers and their affiliates to account. These robocallers are criminals and lawbreakers, they deserve no special protections from any court. Every time one of these robocallers gets away with one legal action, millions and millions of robocalls continue to flow.

5. As plaintiff has made clear in attachment 3 titled "Model of Responsibility," there are simple legal means for defendants in this case and similarly situated to address and prevent the abuse described here. Defendants simply choose not to use any because there is currently no legal-financial pressure on them to do so. The correct and probably only valid way problems like this can be remedied is if the courts aggressively punish common carriers, telemarketers, and the executives running them for taking no effective measures to curb the abuse they fund and are unjustly enriched from. To say some civil infractions or crimes are unpunishable and

24

unstoppable because 'nobody is responsible' is ridiculous, alien to the concepts of American Jurisprudence, and exactly the reason plaintiff included Summers v. Tice in his original complaint. Some human being must be responsible when civil damage or crime happens, and companies are responsible when there is clearly no documentation of reasonable avoidance of civil or criminal liability.

## IV.  CONCLUSIONS

### A.  The chilling effect of the billable hour

1.  It is the chilling effect of the billable hour that is responsible for the almost complete disappearance of jury trials in America. Normal middle and lower class Americans obviously cannot afford $300/hour attorneys to fight for their rights and peace anymore, so these attorneys overwhelmingly work for large corporate interests, and those same large corporate interests do not want normal people in court, before jurys, having their civil rights validated. It is not complicated, it is not hard to see, it is not hard to fathom or understand. There is an obvious contrast in the way pleading is described in statutes and case law, and the way it actually plays out in modern courts under the guidance of the gate-keeping "professionals" standing in the way of jury trials. Gross amounts of economic damage are happening in America every day because normal people cannot flex their rights at any time to say "No. Stop. Don't." Courts are embracing a "Corporations vs Real Humans" policy and corporations are winning. No American civil rights are real in modern America until courts acknowledge they must embrace all requests for jury trial under the 7th amendment.

### B.  The chilling effect of the billable hour in this case

1.  Plaintiff counted at least 47 separate times the counsel for defendants relied on ad hominem, misrepresentation, material omission, conflicting certifications, and their own clients' malfeasance, misfeasance, and nonfeasance to construct their faulty motions to dismiss this complaint while reviewing all these separate motions. If we were to air this Pleading-Trial on live television (because this is a bench trial by pleading), to show average Americans what their 'rights' really look like, how large unscrupulous corporate actors get away with harassing even the consumers of the world's greatest economic superpower, and why ridiculous

economic abuse like spam calls continues, they would be horrified. This would be the top rated horror show of the decade.

2.   Defendants' attorneys have used many fancy words, a lot of Latin, they have cited hundreds of generic cases, but they have literally not, even with extensions granted by the court to investigate, presented a shred of material fact showing how they operate, who operates their companies, or who makes these spoofed snowshoe calls. It is no exaggeration; plaintiff cannot identify any material facts in responses from defendants, only case law and complaints about the federal rules of civil procedure. To a layperson, this is incredibly absurd; the courts should not depart this far from the reason of the citizens it serves, especially when a jury trial is guaranteed in plain words via the 7th Amendment.

3.   Multiple defendants in this case ended up with the same legal counsel, Hall Estill. Southbay admittedly couldn't find any other representation with months of notice. Even among members of the legal profession, which plaintiff clearly has a low opinion of, it was difficult for defendants to find anyone dishonorable enough to take and waste this much money on all this excessive pleading knowing this case should not be fought in pleading like this. The reason none of the telemarketing firms here could find any other representation is because their defense plan, *to cause unnecessary delay, or needlessly increase the cost of litigation, to make frivolous claims, to make contentions without factual support, and to make denials unwarranted by any material fact*, is a loser, even among the legal community which cares only about the reason of the legal system and precedents. Nobody but Hall Estill would take this case to represent these telemarketers. Plaintiff commends the one legal team for Level 3 Communications for filing a general denial instead of a motion to dismiss; while plaintiff still believes all parties should explain what investigative steps they took in the last six months to remedy this problem, Level 3 Communications *at least* acknowledge an answer is required, represented their client in the best fashion they ethically and legally could, and skipped the games that are literally ruining the legal system and have left this country with civil jury rates less than a fraction of a percent.

**C. The problems with robocalls**

1.   To say robocalls are problematic is an understatement. To say that people overwhelmingly hate robocalls is a perfectly accurate statement, if a strong one. These calls do not support the economy. These calls ruin the use of the public American Telephone system, they are both a public and private nuisance to over 80% of Americans. Over 80% of Americans can't even answer their phones anymore. Even State Attorneys General, themselves, call them "the scourge of civilization." Dismissing this case before a jury can hear it would disenfranchise the citizens of this country and jury that would hear this case.

2.   These robocalls have been incredibly damaging for plaintiff, as an ongoing and unstoppable injury. Plaintiff has been called hundreds of times, in the day, in the night. Plaintiff has been screamed at, demeaned, threatened. Plaintiff can't keep his phone ringer on and misses calls from friends, family, and business parties. Each of the defendants named in this case from telemarketers to common carriers to the individuals names is grossly and unjust enriched by these illegal phone calls at plaintiff's expense. Plaintiff has kept records, notified all parties promptly of abuse, plaintiff is happy to have his phone records subpoenaed directly from the phone company. Plaintiff has obscured and hidden no information and is happy for any and all information to be put on the public record and examined before a jury. Defendants in this case have all the control and ability to stop these calls, but allow them to continue to become grossly, unjustly enriched.

### D.  The validity of plaintiff's complaint

1.   Plaintiff has modeled his complaint off many recent and relevant actions filed by various State Attorneys General like the ones listed in this motion filed by Indiana SAG Tod Rokita. While plaintiff's complaint might not reach the level of perfection obtained by SAG Tod Rokita, it contains all the same vital elements, additional relevant elements of common law, and should be construed liberally to achieve justice. The complaint is well-plead by traditional standards.

2.   When a court considers the topics that include construing pro se complaints liberally, the 7th Amendment requirement of jury trial when demanded, the stated purposes of the pleading stage of an American civil jury trial, and the stated aims of the Federal Rules of Civil Procedure, only one rational conclusion can be made: the standard to meet for dismissing a complaint with prejudice in

27

pleading, especially a complaint filed by a pro se litigant, is <u>incredibly high</u>. A complaint like this is nowhere near this incredibly high standard. Each of the defendants should at most have asked for clarity before filing answers to this complaint, empty motions to dismiss are an attack on civil rights in scenarios like this.

    3.  The defendant attorneys themselves in this case have certified this complaint is "well-pleaded" under the "Well-pleaded complaint rule," the basic standard to meet when filing or agreeing with a Notice for Removal. No material facts have been submitted to change the circumstances of this case. Plaintiff has not amended his complaint in any way. The complaint is well plead and this case should next be decided in summary judgment or in jury trial.

## E. Summary

    In an embarrassing spectacle in part derived from poor personal decision making and in part derived from sinking general legal standards regarding the preservation of a guaranteed trial by jury, attorneys for the defense in this case have produced hundreds of pages of case law and abstractions without saying a single thing of material relevance to the case at hand here. The defendants and their legal teams are a joke of pretense, obfuscation, fraud, and unjust enrichment, and each contributes to the lessening of society in various ways. There is no reason this court should dismiss any part of this complaint. Plaintiff prays this court will deny all motions to dismiss, and plaintiff prays the court will grant summary judgment when he requests it if defendants have not at minimum identified the lead sources referenced in this matter many times.

Respectfully submitted,

/s Anthony Trupia
605 SE 21ST St.
Oklahoma City, OK 73129
516-984-0142
Trupiaar@gmail.com
Pro Se

Date: 07/22/2024